## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## (ATLANTA DIVISION)

| | |
|---|---|
| CHUVALO M. FERRELL<br>1040 Flat Shoals Rd SE<br>Conyers, GA 30013<br>　　　　　　　Plaintiff,<br><br>v.<br><br>Bravo Media, LLC.<br>30 Rockefeller Plaza<br>New York, NY 10112<br><br>and<br>NBCUniversal Media, LLC.<br>30 Rockefeller Plaza<br>New York, NY 10112<br><br>and<br>Truly Original, LLC.<br>120 Broadway, 17th Floor<br>New York, NY 10271<br><br>and<br>Shanae Humphrey<br>5307 Wilkinson Ave. Unit 6A<br>Valley Village, CA 91607<br><br>　　　　　　　Defendants | )<br>)<br>)<br>)<br>)<br>) Case No.:<br>)<br>)<br>)<br>)<br>)<br>) JURY TRIAL DEMANDED<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR DAMAGES,
## INJUNCTIVE, AND DECLARATORY RELIEF

**COMES NOW** Plaintiff, Chuvalo M. Ferrell, by and through undersigned counsel and sues the below listed defendants Bravo Media, LLC., NBCUniversal Media, LLC., Shanae Humphrey and Truly Original, LLC. and states as follows:

## INTRODUCTION

1.     This action arises from a willful campaign of intentional defamation carried out by Kelli Potter and Defendants Bravo Media, LLC., NBCUniversal Media, LLC, Shanae Humphrey and Truly Original, LLC., all of which devastated the business, property, and reputation of Plaintiff Chuvalo M. Ferrell. The facts here span from the year 2022 through 2025 and continue to date; to include intentional material misrepresentations in court filings and proceedings encouraged and orchestrated with the assistance of and by producers of The Real Housewives of Atlanta, television show; a fabricated story line of alleged physical abuse to cast member Kelli Potter sensationalized and promoted for television ratings, despite first-hand knowledge by the show's producer(s) that said story-line was false; and, the continued degradation of the personal and professional reputation of Mr. Chuvalo Ferrell through lies, defamation and slander all amplified by repeated national broadcasts by defendants.

## PARTIES

2.     Chuvalo M. Ferrell is the original founder and sole legal architect of Nana's Chicken and Waffles, having funded the business entirely from a $174,000 Warner Bros. payment, signed all foundational leases and filings, and registered the restaurant's trademark and State charter in his own name in 2016. Mr. Ferrell was the only initial listed owner according to State and trademark records and was responsible for all business operations and expansion through 2022.

3.     Bravo Media, LLC ("Bravo") is a cable television network, subsidiary of NBCUniversal, with offices at 30 Rockefeller Plaza, New York, NY 10112, producing and broadcasting "The Real Housewives of Atlanta." Despite receiving explicit notice and documented evidence, on April 23, 2025, and thereafter, disproving claims made by Kelli Potter about Chuvalo M. Ferrell, Bravo continued to publish, air, and amplify these defamatory statements through nationally broadcast TV segments, reunion specials, and a variety of official online/social media channels between 2022 and 2025—resulting in severe, quantifiable damage to Mr. Ferrell's reputation and business interests.

4.     NBCUniversal Media, LLC ("NBCUniversal") is the parent company of Bravo, exercising editorial, legal, and executive oversight over all its productions and online content, with a principal office at 30 Rockefeller Plaza, New York, NY 10112. NBCUniversal directly received cease and desist demands and factual refutations of the defamatory material aired about Chuvalo M. Ferrell and continued to allow publication and national syndication of the false information despite repeated notice and the corporation's prior involvement in comparable, high-profile defamation lawsuits and settlements.

5.     Truly Original, LLC. is the production company responsible for creating and producing The Real Housewives of Atlanta for Bravo. The company is currently run by Glenda Hersh and Steven Weinstock.  Truly Original specializes in alleged unscripted "reality" programming, with The Real Housewives of Atlanta as one of its flagship series. As producers, Truly Original handles all

aspects of development, filming, and post-production for the show, working in partnership with the network Bravo, which broadcasts the series.

6.    Shanae Humphrey, Truly Original, LLC.'s executive producer, who at all relevant times served as the liaison between Bravo/NBCUniversal and Truly Original, LLC. encouraged and crafted Kelli Potter's false storyline that Chuvalo Ferrell was a criminal, stole from their business and was a so-called "dead-beat dad."

## JURISDICTION AND VENUE

7.    This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, including but not limited to 15 U.S.C. § 1125.  The Court possesses supplemental jurisdiction under 28 U.S.C. § 1367 over all related state law claims.

8.    Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because Plaintiff resides, maintains his principal places of business, and regularly conduct substantial business activities in this District and a substantial portion of the tortious conduct giving rise to these claims occurred in this District through broadcast origination, editorial decisions, and publication activities.

## FACTS COMMON TO ALL COUNTS

9.    In 2016 Chuvalo M. Ferrell received $174,000 from Warner Bros. for his work with an artist and exclusively used these funds to launch Nana's Chicken

and Waffles, personally executing the foundational lease agreement with only his name appearing on the lease as lessee.

10.    November 10, 2015 Chuvalo M. Ferrell files for the trademark for Nana's Chicken and Waffles solely in his own name (USPTO application for "Nana's Chicken-N-Waffles," Reg. No. 5115529 issued January 3, 2017).

11.    On March 21, 2016 Mr. Ferrell registers Nana's Chicken and Waffles with the Georgia Secretary of State under his name. Meanwhile, Kelli Potter (formerly Kelli Potter) operates "One Fab Event," which accumulates negative reviews dating since July 8, 2015.

12.    All recipes and ingredients for all items on the menu at Nana's Chicken and Waffles are that of Mr. Chuvalo Ferrell's, from his traditional Louisianna background and upbringing that had been passed down through his generations, down to his parents to him.

13.    March 1, 2022, Chuvalo Ferrell and Kelli Potter jointly applied for and signed for $420,000.00 in building funds, including a commercial business loan, for Nana's building expansions.  Mr. Ferrell sought to expand to two different locations.  Potter and Ferrell discussed and agreed that the money was strictly for opening the two new locations.

14.    Between March 13 and March 16, 2022, unbeknownst to Mr. Ferrell, while out of the country Kelli Potter spends tens of thousands of dollars on her birthday and other unauthorized personal expenses, from the business account in which

the loan funds were deposited, violating their agreement, the loan terms, and federal law.

15.    The account from which Potter pulled these unauthorized funds from was the bank account of Mr. Ferrell, opened at the time he opened Nana's.  Potter had access to said account as her name was added as a signatory to the account shortly after it was opened.

16.    Nevertheless, funds placed in this account in the year of 2022 were strictly for building expansion purposes only.

17.    March 16, 2022, Mr. Ferrell received word from Ferrell and Potter's business advisor of Potter's unauthorized spending.  In response, and at the advisement of their financial advisor, Mr. Ferrell moved the remaining loan funds from the business account to safeguard from Potter's unauthorized use until they were able to contact Potter to address the missing money.

18.    From March 16, 2022 through April 28, 2022, due to Potter's unauthorized conduct, their business advisor suggests negotiating an operating agreement; to which Ferrell and Potter worked out detailed terms of an Operating Agreement and execute same, confirming Ferrell's granting Potter 50% ownership in Nana's at the McDonough location and the Conyers location; and also prohibiting Potter from spending funds from the business account without prior authorization from Mr. Ferrell.

19.    Due to Potter's unauthorized conduct, the Operating Agreement specifically addressed the following:

a.   Prohibition of Commingling, in that "All personal expenses—including mortgage, credit cards, tuition, rent—must be paid strictly from personal funds. Commingling of business and personal funds by any partner is expressly prohibited."

b.   Loan Proceeds: "Loan funds for expansion and cash flow support must be placed in a separate, restricted account, with no checks or debit cards. Any withdrawal or transfer requires dual signatures from both Mark Ferrell and Kelli Potter or must be through a third-party trust account."

c.   Strict Adherence Penalty: "Any violation of these financial procedures (such as misusing business funds or commingling) allows for dissolution of the entity and loss of the violating party's ownership in any new business that continues Nana's Chicken-N-Waffles' operations"

d.   As to Potter's possible violation of the agreement, if Kelli Potter violates the agreement's financial controls, she risks dissolution of her newly granted ownership and forfeiture of any claim to a new entity's ownership if it continues Nana's operations

20.   These measures collectively were needed to ensure careful control of company funds, transparency, and specifically constrain Kelli Potter (among all members) from unauthorized or personal use of business money, with significant penalties for non-compliance.

21.    Satisfied with the Operating Agreement in place, Mr. Ferrell immediately put $334,000.00 of the loan funds back into the business account; reflexive of the entire loan amount, minus Potter's unlawful spending and monies paid to building contractors.    Mr. Ferrell continued paying contractors for Nana's building expansion projects.

22.    April 6, 2022 angry with these responsible constraints on her and mandates that she stop mismanaging business funds, Potter fabricated a story that Mr. Ferrell "stole" money funds from her and filed an emergency petition Rockdale County Superior Court.  No notice of same was ever served on Mr. Ferell.

23.    April 7, 2022 Judge Bills, without scrutinizing Potter's petition, entered a temporary restraining order and interlocutory injunction against Mr. Ferrell. Again, no notice of this order was served on Mr. Ferrell.

24.    From April 1 through December 6 of 2022, Mr. Ferrell deposits the entire $420,000 in installments to the joint Navy Federal Credit Union account, including monies unlawfully spent by Kelli Potter. More than $320,000 is repaid before a critical June court hearing; full repayment was achieved by December 6, 2022. Deposits are documented by bank records and legal correspondence.

25.    May 2, 2022 Plaintiff Ferrell advised both Potter and their business advisor that, "I did another $70,000.00 this morning, bringing to 278,257.18 please let's get on track this month with operation contract that was put in place … personal expenses transferred to personal accounts  …"

26.     May 2, 2022 Potter responds to Mr. Ferrell's message to the group advising

that: "All of my accounts have now been switched to my personal acct. anything

that comes out of the company account pertaining to the following:

> Airlines/Traveling
>
> Uber
>
> PR
>
> Etc

Are all company expenses will provide receipts for records. Thank you."

27.     May 2, 2022 via text message Potter is reminded that "Uber is not business

in Atlanta unless you referring to your DC trip"

28.     Despite Potter's active participation in discussions about and access to all

business accounts and negotiations on the business funds as well as the building

expansion projects, with Ferrell and their financial advisor, Potter continues her

misrepresentations and fraud on the court behind Ferrell's back and presses

forward with her assertions that $420,000.00 was allegedly stolen from her, and

that she was somehow excised out of the business affairs.

29.     June 13, 2022, Rockdale County Superior Court Judge Bills presided over

a hearing on Potter's petition filed on April 6, 2022.  The hearing was held without

notice to or service on Mr. Ferrell or his business, Blak on Blak Enterprises, Inc.

Accordingly, neither were present at said hearing.

30.    Judge Bills addressed Potter's allegation that a $420,000.00 business loan was allegedly stolen from her and a host of other fabrications and material misrepresentations in which she requested the court:

      a.  Enter a restraining order and injunctive relief to prevent further dissipation or transfer of funds and assets by the respondents.

      b.  Declare judgment affirming her "sole ownership" of the funds and property, as well as the imposition of a constructive trust over the alleged misappropriated assets.

      c.  Find emotional and physical harm to Potter as a result of the alleged acts, including anxiety, depression, stress-related ailments, and fear of losing the business

      d.  Find that, Mr. Ferrell allegedly canceled business transactions and expansion efforts for the company without authority, with the intent to inflict financial, reputational, and operational harm on Potter and the business.

31.    Potter's written and sworn allegations were patently false and directly contradicted by the controlling Operating Agreement negotiated for and signed by her in April of 2022 as well as Mr. Ferrell's business originating documents filed with the State of Georgia and Potter's own statements to both Mr. Ferrell and the parties' financial advisor revealing both parties have ongoing oversight and active dispute resolution as to any personal versus business expenditure.

32.     Potter had active managerial participation/oversight, and both parties were aware and actively handling business vs. personal expenditures consistent with the operating agreement in effect.

33.     Further, Potter's May 2, 2022 text messages to Mr. Ferrell and the parties' business financial advisor show both parties acknowledging a delineation: Potter affirms her personal expenses are separated, and clarifies to Ferrell that travel, Uber, PR, etc., are company expenses and will be justified with receipts. The business advisor's reply demonstrates ongoing oversight and active dispute resolution—contradicting Potter's claim of deprivation of managerial participation/oversight, reveals that both parties were aware and actively handling business vs. personal expenditures.

34.     Additionally, Potter's May 2, 2022 group text messages shows that Ferrell reports to Kelli Potter and their business advisor of an additional $70,000 transfer and his running total of $278,257.18 was placed in the business account, asking for the group to adhere to the operating contract. Potter does not dispute the numbers or the purpose, and only clarifies the categorization of expenses and affirms change in her own accounts.

35.     Despite a lack of service on Mr. Ferrell or his business, Janice Morris, Court Clerk of Rockdale County Superior Court, nevertheless, set Potter's case for the subject hearing.  Morris intentionally failed to verify lack of service on Mr. Ferrell or his business and further intentionally failed to send sufficient and proper hearing notice to Mr. Ferrell of the June 13, 2022 proceedings; giving Kelli

Potter a strategic advantage over Mr. Ferrell violating his procedural, substantive due process rights, access to the courts as well as O.C.G.A. § 9-11-4.

36.    At the June 13, 2022 hearing, Kelli Potter falsely represents that a $420,000.00 loan fund was never returned to the business account by Mr. Ferrell, including the funds she improperly spent on her personal affairs and events. Potter further intentionally omitted the fact of a current Operating Agreement signed by her and Ferrell in April of 2022 existed at the time of the hearing; and, wrongfully claimed to be the exclusive owner of Nana's. Judge Bills, shockingly and against all ethical and legal standards, adopted these bald allegations without any reliable documentation supporting same.

37.    June 13, 2022, Potter further represents that, "Chuvalo Ferrell stole $420,000..." and "He never put any money back—he wanted to destroy me and my business." Potter further falsely asserts (in court, social media, and to the media), "He threatened my life and said, 'I'm going to kill you.'"

38.    Judge Bills failed to scrutinize the lease agreements for the new building locations subject to the building projects Mr. Ferrell had continued to undertake and manage. Judge Bills then erroneously concludes that assets should be placed under Kelli Potter's control, and that Mr. Ferrell unlawfully excluded Kelli Potter from business and financial rights.

39.    June 17, 2022, having no objective documentation of same and failing to verify proper service on Mr. Ferrell or his business; or, the court clerk's intentional failure to send a hearing notice to Mr. Ferrell, Judge Nancy Bills enters

an order awarding Potter $770,000.00 ($420,000 for the business loan, $150,000 for alleged pain/suffering, and the remainder attributed to the court's determined value of business assets of Nana's).

40.    Throughout 2022–2024: Potter continues her defaming of Mr. Ferrell in public filings, and with the assistance of Defendants, on television, and social media, accusing Mr. Ferrell of theft, fraud, violence, repeatedly stating in the Real Housewives of Atlanta, "he never put any money back" and "He threatened our family."

41.    January 12, 2024 Mr. Ferrell appears at a child support hearing *pro se*. In it, Potter raised her April 6, 2022 emergency petition for injunctive relief and again fraudulently claimed that the $420,000 was never returned to the business account.  Surprised by the change in subject matter for the present hearing, Mr. Ferrell requested time to produce the physical records of full monies re-payment (which were also in the possession of Kelli Potter at the time of the hearing), including the monies unlawfully spent by Kelli Potter.  Mr. Ferrell's request is denied

42.    Judge Nancy Bills, with malice and a calculated disregard for the rights of Chuvalo Ferrell, intentionally and without warning pivoted to address this wholly separate court case and subject matter, namely allegations of money paid or re-paid under an emergency petition for injunctive relief that was not part of the pending divorce or child support docket.

43.    Judge Bills provided no advance notice or case reassignment to Mr. Ferrell before addressing this unrelated matter, thereby catching him entirely by surprise and depriving him of the ability to be prepared, to present evidence, or to consult with counsel regarding the distinct claims, defenses, or procedural posture of the separate case.

44.    Bills' ambush-style maneuver was executed with the sole purpose of manufacturing grounds to hold Mr. Ferrell in contempt of a court order on matters outside the scope of the properly noticed proceedings, in knowing violation of Georgia procedural law and Mr. Ferrell's fundamental due process guarantees. Judge Bills's actions subverted Mr. Ferrell's right to meaningful notice, fair hearing, and the opportunity to be heard, while also intentionally thwarting his statutory rights to appeal and to effective assistance of counsel, and amount to a flagrant abuse of her judicial authority.

45.    Judge Bills maliciously mocked Ferrell in open court, shouted at him for not having on his person bank records proving his re-payment two years prior then jailed him under the guise of contempt of court order for allegedly not paying back his own bank account $420,000.00; though it was in fact re-paid over two years prior; of which Potter has personal knowledge of.

46.    Ferrell remained incarcerated for 41 days.

47.    In January of 2024 Potter is granted a protective order, upon claiming in court filings and on the Real Housewives of Atlanta (RHOA) that Mr. Ferrell

said he would "kill" her at the time he was arrested for contempt at the January 12, 2024 court proceeding.

48.    Potter's court filings assert Mr. Ferrell's actual words were "I'm going to get you." Mr. Ferrell in fact stated, "OK, I gotcha," meaning legal justice, not that physical harm will come to anyone.

49.    As a result of Potter's intentionally false statements and adverse publicity, Mr. Ferrell, among other things, suffered continued loss of reputation and was saddled with the stain of a protective order against him on false pretenses amplified by defendants through the RHOA.

50.    At a February 15, 2024 hearing, upon being confronted with the very bank records Potter had in her possession prior to every court hearing finally admits through counsel, that the $324,000.00 had been repaid to the joint account on the business loan monies before June 2022 (including the funds she unlawfully spent from the joint account on her personal affairs and gifts), contradicting her prior sworn and intentionally false statements.

51.    Accordingly, on February 20, 2024, Mr. Ferrell is released from jail after his new counsel presented bank records already possessed by Potter, conclusively proving Mr. Ferrell repaid the entire $420,000.00, in full, two years prior to the January 12, 2024 hearing for which he was placed in custody solely based on Potter's material lie that the funds were not re-paid.

52.    While in jail, judge Nancy Bills without any documentation of the alleged failure to re-pay the $420,000.00 authorized Potter to force sell Mr. Ferrell's

15

home and permitted destruction of all items inside.  His home was sold by Potter and all items and personal property of his inside were destroyed or stolen under the watch of Potter.

53.    As of February of 2024, Mr. Ferrell was owed $89,000 from the sale of his home, however, instead of paying Mr. Ferell out his fair share of the sale proceeds, Potter unlawfully withheld Mr. Ferrell's funds and diverted $15,000 of same to a third party, without Mr. Ferrell's consent or authorization.

54.    March 9, 2024 Mr. Ferrell experiences homelessness after all his property is seized and or disposed of.

55.    In June of 2024 Potter, after diverting Ferrell's funds filed for contempt of court seeking to incarcerate Mr. Ferrell again, alleging missed child support payments all while continuing to wrongfully withhold from Mr. Ferrell, the proceeds from the sale of his home, which she unilaterally and wrongfully reduced to $74,000.00 by disbursing $15,000.00 to a third party without Mr. Ferrell's authorization.

56.    On August 14, 2024 Mr. Ferrell is jailed again for 7 days for $14,898.00 in child support arrears.  Mr. Ferrell secures his release by payment of the $14,898.00 borrowed from family and friends.

57.    In October of 2024 Kelli Potter, supported by Janice Morris, files a request to garnish $770,000.00 from Mr. Ferrell, despite admitting the court's judgment was based on her material misrepresentations and lies about having $420,000.00 "stolen" from her, and subsequently admitting that the monies were in fact re-

paid by Mr. Ferrell and Mr. Ferrell alone (to include Potter's unlawful loan fraud and spending on personal affairs and expensive birthday gifts). Potter's continued fraud on the court in efforts to collect $770,000.00 from Mr. Ferrell is permitted through the assistance of her friend, court clerk Morris.

58.    October 25, 2024 Potter conspired with Morris to, and did in fact, unlawfully deposit Mr. Ferrell's home sale proceeds into the court, out of Mr. Ferrell's reach, to intentionally deprive him of said funds in violation of the *Homestead Exemption*, under O.C.G.A. sec. 18-4-15; 18-4-5; 18-4-6 and 18-4-53, which protects a certain amount of equity in a primary residence from alleged creditor collection during bankruptcy or garnishment proceedings.

59.    Morris again, at the behest of Potter intentionally refused to send written notice to Mr. Ferrell of his money's present location in the court, preventing Mr. Ferrell from asserting his rights to his money or his valid homestead exemption.

60.    December 11, 2024, Mr. Ferrell attempts to make another child support payment. The payment is rejected and blocked by Kelli Potter.

61.    In July of 2025 Mr. Ferrell learns for the first time that his remaining $74,000.00 from the sale of his home, was deposited into the court's escrow account by Potter and retained by Janice Morris without prior notice to Mr. Ferrell or an opportunity to contest the depositing of his funds from the sale of his primary residence.

62.    Throughout 2022–2025 at the behest of Potter, Janice Morris while blocking Mr. Ferrell's access to the courts and withholding critical hearing and

filing notices from Mr. Ferrell, repeatedly abused her office to promote Potter and Nana's on social media for her and Potter's personal gain and to the detriment of Mr. Ferrell. The personal relationship of Potter and Morris, clear conflict, and bias against Mr. Ferrell, further benefiting Potter remained unknown to Mr. Ferrell.

63.   Bravo and NBCUniversal, through Truly Original, LLC.'s executive producer, Shanae Humphrey, who at all relevant times served as the liaison between Bravo/NBCUniversal and Truly Original, LLC. encouraged and crafted Kelli Potter's false storyline that Chuvalo Ferrell was a criminal, stole from their business and was a so-called "dead-beat dad."

64.   Shanae Humphrey, conspired with Potter to promote the false light storyline against Mr. Ferrell

65.   Shanae Humphrey accompanied Potter to court proceedings in August of 2024, and on at least one occasion sat in the courtroom in order to engineer drama against Mr. Ferrell for ratings.

66.   Humphrey sat in on proceedings and heard information in open court that she knew contradicted what she later portrayed and produced in the show Real Housewives of Atlanta.

67.   Shanae Humphrey encouraged and participated in the development of and distribution of a false story about Mr. Ferrell and the State of his relationship with his business, his house and his children Humphrey knew would be aired on the Real Housewives of Atlanta.

68.    Humphrey controlled the process of shaping the false narratives against Ferrell with the knowledge and approval of Bravo/NBCUniversal with the aim to creating a sensational storyline that they knew was not true.

69.    April 23, 2025 Mr. Ferrell served a cease and desist on Bravo and NBCUniversal, demanding immediate retraction of Potter's false claims.  Mr. Ferrell included supporting documentation and proof of Potter's lies, placing the network and producers on actual notice.

70.    In May of 2025 as a direct result of the constant onslaught of attacks on Mr. Ferrell's reputation and allegations that he was a thief who allegedly stole $420,000.00, by Defendants, a lucrative business opportunity failed.  Despite the business prospect's representative's execution of the relevant business paperwork, they made clear the constant slander and allegations of theft by Defendants Bravo (through Truly Original, LLC, its production company) forced them to pull out of the deal.

71.    May 6, 2025, Bravo, through Truly Original, LLC, its production company, responded to Mr. Ferrell's cease and desist, in writing.

72.    Bravo, through Truly Original, LLC., its production company, asserted that "The Real Housewives of Atlanta" is a First Amendment-protected expressive work that lawfully depicts real events and relationships as they occur.

73.    Bravo/Producer claimed all criticized statements are either opinion or corroborated by multiple sources, including judicial findings. They highlighted

their editorial process is consistent with First Amendment principles, and stated future references to Mr. Ferrell will be handled in this protected context.

74.     Despite their response to Ferrell's cease and desist, Bravo and its producers possessed a copy of, and thoroughly reviewed, and understood the unambiguous February 2024 Purge Order authored by Judge Bills, which specifically and with particularity debunked Potter's continued misrepresentation that $420k was stolen from her and allegedly never returned; as Judge Bills' Order specifically states $420k was paid directly to Kelli Potter before Potter's request to have Ferrell jailed over the $420k building funds.

75.     Bravo/Producer further noted that neither they nor NBCUniversal were parties to the September 23, 2024 court order referenced by Mr. Ferrell, and filming for the concerned season was completed before the order went into effect.

76.     Finally, Bravo/Producer stated Ms. Potter had full custody of the minor children at the time she consented to their filming, illustrating that Defendants knew and had actual knowledge of the false statements of Potter as to loan money, child support, assertions of in court threats, wrongfully alleging Ferrell is a thief and their lack of authority to tape and broadcast Ferrell's minor children.

     a.     On or about March 3, 2023, Defendants Bravo Media, LLC, NBCUniversal Media, LLC, Truly Original, LLC, through their executive producer Shanae Humphrey, began filming segments for the Bravo television series The Real Housewives of Atlanta

featuring Kelli Potter, during which the minor children of Plaintiff Chuvalo M. Ferrell were recorded and depicted on camera without Plaintiff's knowledge or consent. At all relevant times, Plaintiff shared joint legal custody with equal decision-making authority under an existing Georgia custody order, and Defendants knew or reasonably should have known that written consent from both parents was required for any commercial use of the children's likenesses on national television.

b.  The first unauthorized broadcast of Plaintiff's minor children occurred on or about April 14, 2025, during The Real Housewives of Atlanta Season 15. Subsequent rebroadcasts and promotions aired on May 21, 2025 (Episode 3, "A Family Matter"), July 16, 2025 ("Tensions and Truth"), and July 13 and 20, 2025, during the Season 16 reunion specials. In each instance, the children's faces, voices, and identities were displayed to a nationwide audience in connection with a dramatized storyline portraying Plaintiff as a violent or absent father, without his authorization or opportunity to object and revealed private medical information broadcasters did not have authority to broadcast. Those depictions were further distributed on Bravo's official website, streaming platforms, and its verified social-media accounts.

c.  At no time did Plaintiff Chuvalo M. Ferrell sign a media release, consent form, or authorization permitting Defendants to record or publicly disseminate visual or audio material of his minor children, nor was such consent sought by any Defendant before production or broadcast. Despite receiving an April 23, 2025 cease-and-desist letter expressly demanding removal of this footage, Defendants continued to rerun and promote the offending content through summer 2025. Defendants' public response on May 6, 2025, acknowledged the children's inclusion and admitted that filming occurred under Ms. Potter's consent alone—an admission that Defendants knew Plaintiff's consent had not been obtained.

d.  The unlawful filming and broadcast of Plaintiff's minor children caused lasting emotional distress and reputational injury to Plaintiff Ferrell and violated his federal and state rights as a custodial parent to determine the exposure, likeness use, and commercial portrayal of his children. The repeated rebroadcasting and online streaming of this content after written notice demonstrate Defendants' willful, wanton, and reckless disregard for Plaintiff's protected parental and privacy interests.

e.  On October 2, 2025, in the Superior Court for Rockdale County, a filing submitted by Ms. Potter on behalf of Bravo acknowledged that Bravo's production team failed to secure legally required consents

for filming Plaintiff's minor children.    This judicial admission constitutes direct evidence of Defendants' knowledge of and participation in privacy violations.

77.    From April–July 2025 Bravo/NBCUniversal ignored the cease and desist and continue to broadcast and promote the defamatory statements, causing hundreds of thousands of hostile comments towards Mr. Ferrell and business loss to Mr. Ferrell.  Bravo and NBCUniversal ignore the cease and desist and continue to broadcast these claims in RHOA Season 16 (April–July 2025) and reunion specials (July 13, 20, 27, 2025). They repeat:

  - "He never put any money back."

  - "He's a criminal, an abuser, and a fraud."

These statements went live on network TV and are distributed widely on Instagram, Twitter/X, Facebook, and official Bravo blogs—prompting hundreds of thousands of critical and hostile comments about Chuvalo Ferrell; including but not limited to:

> a.    theJasmineBrand reported direct viewer responses such as, "Lock him up and throw away the key. Kelli deserves better than this deadbeat," and "Another Bravo husband stealing, lying, and dumping his kids. It's disgusting!" (https://thejasminebrand.com/2024/08/29/rhoa-newbie-kelli-ferrells-ex-husband-thrown-in-jail-for-failing-to-pay-nearly-15k-in-child-support/)

b.   The Real Housewives of Atlanta's Season 16 coverage on Sportskeeda observed social media users posting, "So sick of Bravo platforming actual criminals. Ferrell really tried to blame Kelli after robbing the family blind," and "You can see why she left him. No real dad would walk out and leave his kids with debt like that," reflecting the public outrage following the Bravo-aired narrative (https://www.sportskeeda.com/us/reality-tv/the-real-housewives-atlanta-star-kelli-s-ex-husband-issues-cease-and-desist-order-seeking-public-clarification)

c.   "If he's a thief and a deadbeat dad as Bravo claims, why's he still walking free?" and "Bravo really went low with Ferrell's story. Trash, if true" (https://www.realitytea.com/2024/06/18/rhoa-kelli-ferrell-ex-recently-jailed/)

78.   As a direct result of BRAVO/NBCUniversal's constant publication of Potter's lies, Mr. Ferrell's business and personal reputation are destroyed. Investors end ties—documented by business communications.

79.   As a direct result of BRAVO/NBCUniversal's constant publication of Potter's lies, Mr. Ferrell suffers depression and severe emotional distress. He has lost his professional reputation and social standing; lost his career and future contract and employment offers drastically reducing future earning capacity; he has been forced to hire counsel to defend against these defamatory statements and accusations; he has suffered and continues to suffer shame, humiliation, post-

traumatic stress disorder, anxiety; suffers feelings of being unfairly judged by friends, family and the larger public; he has lost the ability to enjoy previously meaningful relationships, activities and general life satisfaction.

80.    Being publicly branded a criminal, thief and deadbeat destroyed his parent-child relationships, caused his children to face ridicule, and have lead to restrictions on parental involvement.

81.    Mr. Ferrell has been subjected to the "Google effect"—where stories, videos, and news clips from Bravo and other outlets live online indefinitely, so Mr. Ferrell's name remains permanently associated with these false accusations.

82.    June 5, 2025 In *Brit Eady v. Bravo/NBCUniversal,* et al. (NY Sup. Ct.), Bravo faces a $20 million defamation lawsuit over producing and broadcasting knowingly false, defamatory content aired after legal notice and demand. The complaint references Bravo's "willful, reckless disregard for the truth," echoing Mr. Ferrell's experience

83.    January 2024 In *Caroline Manzo v. Bravo/NBCUniversal*, plaintiff sues the network for broadcasting manufactured controversy and refusing to respond meaningfully to pre-publication warnings and formal complaints of reputational harm.

84.    February & June of 2024, Similar claims are raised by Leah McSweeney and Caroline Manzo against Bravo/NBCUniversal.  In Leah McSweeney v. Bravo/NBCUniversal, similar claims are made regarding intentional slander and

the network's refusal to retract or correct false, damaging content despite notification.

85.    February 20, 2025, NBCUniversal settles a national news defamation suit (doctor falsely labeled "uterus collector") after airing false claims post-cease and desist, with an admission of fault and a multi-million dollar confidential settlement for actual malice.

86.    August 18, 2025, Newsmax, another broadcaster, reaches a $67 million settlement with Dominion Voting Systems after continuous publication of proven-false statements in direct defiance of multiple legal warnings and cease and desist letters, demonstrating the legal consequences of post-notice defamation by a broadcaster.

87.    The cumulative and direct result of defendants' actions cause Mr. Ferrell to suffer enduring emotional distress, humiliation, severe financial harm, and nationwide business and personal ostracism resulting from Bravo/NBCUniversal's continued and repeated publication of false statements, and per se slander despite Mr. Ferrell's cease and desist and Defendant's objective proof to the contrary in the form of a public court order.

## COUNT I: DEFAMATION (LIBEL AND SLANDER)

88.    Plaintiff incorporates by reference all paragraphs as if fully stated herein.

89.    On April 23, 2025, Plaintiff served a comprehensive cease and desist letter on Defendants Bravo Media Productions, LLC and NBCUniversal Media, LLC demanding immediate retraction of false and defamatory statements made by

Kelli Potter and broadcast repeatedly on "The Real Housewives of Atlanta" Season 16.

90.     The cease-and-desist included documentary evidence, bank records, and legal correspondence proving that Potter's statements were false, specifically that Plaintiff had fully repaid the $420,000 business loan by December 6, 2022, including funds Potter had unlawfully spent on personal expenses.

91.     Further, Defendants had in their possession and had thoroughly reviewed Judge Bills' purge order of February 2024 debunking Potter's false narrative that $420,000.00 was stolen from her and that said funds were never "re-paid" or "paid back."

92.     Despite receiving actual notice and proof of falsity, Defendants ignored the cease and desist and continued broadcasting and distributing the defamatory statements from April through July 2025, including in Season 16 episodes and reunion specials aired July 13, 20, and 27, 2025.

93.     The false and defamatory statements included: "He never put any money back," "He's a criminal, an abuser, and a fraud," and "He threatened our family;" all of which were published to millions of viewers on television and distributed widely on social media platforms including Instagram, Twitter/X, Facebook, and official Bravo blogs.  They are still being disseminated and broadcasted to date.

94.     These statements were false, defamatory per se as they accused Plaintiff of criminal conduct, and caused severe injury to Plaintiff's business and personal reputation, resulting in hundreds of thousands of hostile comments and the

documented loss of investment opportunities resulting in substantial financial harm.

95.    Defendants acted with actual malice by continuing to publish these statements after receiving clear and convincing evidence of their falsity, demonstrating knowledge of falsity or reckless disregard for the truth.

96.    As a direct and proximate result, Plaintiff suffered substantial damages to his business, reputation, and personal relationships, and was subjected to public ridicule, contempt, and ostracism.

97.    Defendants' conduct was willful, wanton, and malicious, warranting punitive damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants Bravo Media Productions, LLC and NBCUniversal Media, LLC, jointly and severally, for compensatory $100,000,000.00 for injury to reputation, business losses, emotional distress, and other consequential damages; punitive damages to punish and deter such conduct in the amount of $100,000,000.00 (one hundred million dollars); reasonable attorney's fees where permitted by law; post-judgment interest; and such other relief as the Court deems just and proper.

## COUNT II: FALSE LIGHT/INVASION OF PRIVACY

98.    Plaintiff incorporates by reference all paragraphs as if fully stated herein

99.    Beginning in April 2025 and continuing through July 2025 to date, Defendants' broadcast and widely distributed programming that portrayed Plaintiff in a false light that would be highly offensive to a reasonable person.

100.   Defendants repeatedly aired and promoted Potter's false narrative that Plaintiff was a criminal, abuser, and fraud who "stole" $420,000.00 and "threatened" his family, creating a false impression of violent and criminal conduct.

101.   These portrayals were made despite Defendants' actual knowledge, gained both through Judge Bills' purge Order in February of 2024 and Plaintiff's the April 23, 2025 cease and desist letter with supporting documentation, that these characterizations of being a violent thief were false and misleading.

102.   The false light portrayal was disseminated to millions of viewers through television broadcasts, social media platforms, and online content, causing Plaintiff to be perceived as a dangerous criminal and abuser.

103.   This false portrayal was highly offensive and objectionable to a reasonable person and has subjected Plaintiff to public hatred, ridicule, and contempt.

104.   Defendants acted with actual malice by continuing the false light portrayal after receiving proof of its falsity, or with reckless disregard for whether the portrayal was false.

105.   As a direct result, Plaintiff has suffered severe injury to his reputation, emotional distress, loss of business opportunities, and damage to personal relationships.

**WHEREFORE**, Plaintiff demands judgment against Defendants Bravo Media Productions, LLC., NBCUniversal Media, LLC., Truly Original, LLC., and Shanae Humphrey jointly and severally, for compensatory damages including injury to reputation, emotional distress, loss of business opportunities, and consequential damages in the amount of $100,000,000.00; punitive damages for malicious conduct in the amount of $100,000,000.00; reasonable attorney's fees where permitted; post-judgment interest; and such other relief as the Court deems just and proper.

## COUNT III: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

106.   Plaintiff incorporates by reference all paragraphs as if fully stated herein.

107.   From April 2025 through July 2025, and through the filing of this complaint, after receiving the cease-and-desist letter with documentary proof of falsity and after having Judge Bills' 2024 court order debunking Potter's false story of theft by Ferrell, Defendants engaged in extreme and outrageous conduct by deliberately continuing to broadcast and amplify false accusations against Plaintiff.

108.   Defendants' conduct included repeatedly broadcasting statements calling Plaintiff a "criminal," "abuser," and "fraud" and claiming he "threatened" his family, despite knowing these statements were false.

109.   This conduct was disseminated to millions of viewers and social media followers, generating hundreds of thousands of hostile and threatening comments directed at Plaintiff.

110.   Defendants' actions were extreme and outrageous, exceeding all bounds of decency tolerated in civilized society, particularly given their knowledge of falsity and the massive platform used to inflict harm.

111.   Defendants intended to cause severe emotional distress to Plaintiff, or acted with reckless disregard of the high probability that such distress would result.

112.   As a direct result of Defendants' conduct, Plaintiff has suffered severe emotional distress, anxiety, humiliation, loss of sleep, and other manifestations of psychological injury.

113.   The emotional distress was severe and of such intensity that no reasonable person should be expected to endure it.

**WHEREFORE**, Plaintiff demands judgment against Defendants Bravo Media Productions, LLC., Truly Original, LLC., and NBCUniversal Media, LLC, jointly and severally, for compensatory damages for severe emotional distress and psychological injury in the amount of $100,000,000.00 (tone hundred million dollars); punitive damages for intentional, extreme, and outrageous conduct in the amount of $100,000,000.00 (one hundred million dollars);  reasonable attorney's fees; and post-judgment interest; and such other relief as the Court deems just and proper.

## COUNT IV:
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

114.   Plaintiff incorporates by reference all paragraphs as if fully stated herein.

115.   Plaintiff had existing and prospective business relationships with investors, business partners, and customers, including a documented multi-million dollar investment opportunity.

116.   All Defendants and Kelli Potter knew of these business relationships through the widespread nature of Plaintiff's business activities and the content of their broadcasts which specifically targeted his business reputation for the advancement of their ratings and damage to Ferrell's reputation.

117.   Beginning in April 2025 and continuing through July 2025, Defendants intentionally interfered with these business relationships by continuously broadcasting and promoting false statements about Plaintiff's character and business practices.

118.   Defendants' the television production company, acting through its executives and creative staff, intentionally and knowingly crafted and promoted a false and defamatory narrative depicting Mr. Ferrell as a thief and deadbeat for the sole purpose of sensationalizing its program and generating public interest. Despite possessing full knowledge of the falsity of these claims, the company's producers, including Ms. Humphrey, deliberately concocted and broadcast a made-for-television storyline casting Ferrell in the role of the villain, while falsely portraying Kelli Potter and his children as his victims.

119.   These actions were taken not in pursuit of truth, but rather to serve the production company's financial and entertainment objectives by maligning Mr. Ferrell's character in the public eye, exploiting his reputation, and placing him before millions in an outrageously false light that was highly offensive and damaging to any reasonable person.

120.   This calculated campaign was designed to maximize ratings, promote the show's commercial success, and inflict severe reputational and emotional harm upon Mr. Ferrell, all while the producers and network were fully aware that the narrative they peddled was a manufactured fiction, devoid of factual basis.

130.   Defendants' conduct directly caused the termination of business relationships and loss of investment opportunities, including the documented investment losses.

131.   The interference was unjustified and performed through improper means, namely the publication of known false statements after receiving actual notice of their falsity.

132.   As a direct and proximate result, Plaintiff suffered substantial pecuniary losses and damage to his business reputation and prospects.

**WHEREFORE**, Plaintiff demands judgment against Defendants Bravo Media Productions, LLC., Truly Original, LLC., and NBCUniversal Media, LLC, jointly and severally, for compensatory damages including lost business opportunities, lost profits, and consequential business damages in an amount $100,000,000.00;

punitive damages in the amount of $100,000,000.00; reasonable attorney's fees; post-judgment interest; and such other relief as the Court deems just and proper.

### COUNT V: CIVIL CONSPIRACY

133.   Plaintiff incorporates by references all counts as if fully stated herein.

134.   From the taping of Kelli Potter on the Real Housewives of Atlanta and the airing of the season April 2025 through July 2025, Defendants Humphrey, Bravo Media Productions, LLC and NBCUniversal Media, LLC, conspired and acted in concert with Kelli Potter and others to commit the tortious acts described herein.

135.   Defendants agreed to and participated in a common plan to create a false narrative about Ferrell, broadcast and amplify false and defamatory statements about Plaintiff despite receiving actual notice and proof of their falsity.

136.   Overt acts in furtherance of the conspiracy included creation of the false narrative that Ferrell is a thief and dead-beat dad; their broadcasting and continued broadcast of Season 16 episodes, reunion specials, and social media promotion of false content after receiving the cease-and-desist letter.

137.   Each defendant performed acts in furtherance of the conspiracy, with Defendants providing the media platform and distribution network to amplify and perpetuate the false statements originated by Potter and Humphrey.

138.   The conspiracy was undertaken with the unlawful purpose of generating television ratings and social media engagement at Plaintiff's expense, regardless of the truth.

139.   As a direct and proximate result of this conspiracy, Plaintiff suffered all of the damage described in the foregoing counts.

140.   Defendants' participation in the conspiracy was willful and malicious and for their personal financial gain.

**WHEREFORE**, Plaintiff demands judgment against Defendants Bravo Media Productions, LLC., Humphrey, Truly Original, LLC., and NBCUniversal Media, LLC, jointly and severally, for all compensatory damages resulting from the conspiracy including reputational harm, business losses, emotional distress, and consequential damages in an amount of $100,000,000.00; punitive damages for willful and malicious conduct in the amount of $100,000,000.00; reasonable attorney's fees; and post-judgment interest; and such other relief as the Court deems just and proper.

### COUNT VI – FALSE ADVERTISING, PROMOTION, AND COMMERCIAL DISPARAGEMENT UNDER THE LANHAM ACT (15 U.S.C. § 1125(a))

141.   Plaintiff incorporates by reference all preceding paragraphs as if fully stated herein.

142.   The Lanham Act, 15 U.S.C. § 1125(a), prohibits any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which— in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic

origin of his or her or another person's goods, services, or commercial activities. Such persons shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

143. Defendants Shanae Humphrey, Bravo Media, LLC, NBCUniversal Media, LLC, and Truly Original, LLC (collectively "Defendants") are engaged in the production, broadcast, and promotion of "The Real Housewives of Atlanta," targeting a national audience through television, online streaming, and widespread digital and social media channels.

144. As part of the marketing and commercial promotion of their program, Defendants intentionally fabricated and repeatedly broadcast a storyline portraying Plaintiff Chuvalo M. Ferrell as a "thief," "deadbeat," and as someone who was financially and physically abusive to Kelli Potter and his own children.

145. Defendants promoted these statements and narratives as factual and authentic, using the "reality" format and references to actual court proceedings to lend credibility to the storylines. These messages were strategically designed to increase viewership, boost ratings, and attract advertisers and sponsors by sensationalizing the show's content at Plaintiff's expense.

146. The dissemination and marketing of these false claims were carried out across multiple platforms, including televised episodes, reunion specials, and numerous official and third-party social media accounts managed by Defendants.

147.  BRAVO's trailers and promotion do not merely state opinions or use creative story elements—they expressly state Ferrell is a "thief" and "deadbeat" and reference court proceedings as supporting these claims.  "Thief" and "deadbeat" are presented as objective fact, not hyperbole or opinion.

148.  The false legal accusations are not relevant to artistic expression, but are deliberately misleading and styled as fact.

149.  Defendants repeatedly referenced alleged court hearings and proceedings to give their narrative the imprimatur of governmental or judicial legitimacy all while burying judge Bills' February 2024 order refuting the false narrative that Ferrell is a thief and did not return his $420,000.00 to his own business account since 2022.

150.  Defendants Bravo and their co-defendants intentionally and selectively referenced a 2022 court finding which they knew had been formally corrected and superseded by subsequent judicial orders in 2024, solely to mislead the public and cast Plaintiff in a false and defamatory light. Defendants knowingly ignored and omitted the 2024 judicial finding which established that Mr. Ferrell never stole from Ms. Potter, and in fact returned over $420,000 to his business account in 2022, conclusively absolving him of all wrongdoing. Despite actual knowledge of these facts, Defendants cherry-picked the earlier, uncorrected finding and exploited it within their promotional content, trailers, and episodes, all for the purpose of perpetuating the narrative of theft and financial misconduct against Plaintiff. This deliberate and reckless conduct was designed to give their false

storyline unwarranted legitimacy, deceive the viewing public, and inflict severe reputational and commercial harm on Mr. Ferrell through willful misrepresentation of the true record.

151. Defendants received Plaintiff's April 23, 2025, cease and desist letter, which included judicial records and documentary evidence disproving the false claims relating to the $420,000 and the allegations of abuse. Notwithstanding this notice and abundant evidence of falsity, Defendants continued to publish, rebroadcast, and promote these accusations through July 2025 and beyond, including during Season 16, widely amplifying them to the viewing and consuming public.

152. Defendants' executive producer, Shanae Humphrey, attended court proceedings and was fully aware of direct contradictions to the narrative being promoted. Despite this clear knowledge, Defendants continued to market and profit from the false storyline.

153. The false and defamatory claims caused actual deception among Defendants' audience, resulting in widespread reputational harm to Plaintiff and direct commercial injury—as investors terminated ongoing relationships, business opportunities and partnerships were lost, and customers and affiliates withdrew support for his restaurant and brand. Hostile comments and threats multiplied against Plaintiff across all channels where Defendants promoted the show, linking Plaintiff's business reputation inextricably to the negative portrayal created by Defendants.

154.   Defendants' broadcast and promotion of these falsehoods were made in commerce as part of a systematic and material promotional campaign, and the claims were likely to, and did, deceive a substantial segment of the public and Plaintiff's business audience. The campaign constituted false and misleading statements about Plaintiff's character, professional competence, and commercial activities.

155.   Defendants' conduct was deliberate, willful, and designed to maximize commercial benefit while showing reckless disregard for the truth and Plaintiff's rights.

**WHEREFORE**, Plaintiff Chuvalo M. Ferrell demands judgment against Defendants Bravo Media, LLC., NBCUniversal Media, LLC., Shanae Humphrey and Truly Original, LLC., jointly and severally, for compensatory damages for loss of business, contracts, goodwill, and reputation in an amount of $100,000,000.00; treble damages for willful violation of the Lanham Act as permitted by law; permanent injunctive relief prohibiting further publication and commercial exploitation of the false and misleading claims; reasonable attorneys' fees and all costs of suit; and post-judgment interest; and such other and further relief as this Court deems just and proper.

## COUNT VII – INVASION OF PRIVACY
### (UNAUTHORIZED FILMING OF MINOR CHILDREN)

156. Plaintiff incorporates by reference all previous paragraphs as if fully set forth herein.

157. Defendants Bravo Media, NBCUniversal, Truly Original, and Shanae Humphrey knowingly and without consent filmed, recorded, and publicly aired Plaintiff's minor children as part of The Real Housewives of Atlanta in 2025.

158. Defendants acted with actual knowledge that Plaintiff had not authorized such filming and that Ms. Potter's consent was legally insufficient, as custody orders gave Plaintiff equal joint custody and decision-making authority concerning the children's appearances in media productions.

159. The broadcast constituted an intrusion upon the seclusion and private life of the minors and an appropriation of their likenesses for commercial gain under O.C.G.A. § 10-1-393(b)(25) (Georgia Fair Business Practices Act) and Georgia common law.

160. The unauthorized publication of the children's images to millions of viewers was highly offensive to a reasonable parent and served no legitimate public interest, being undertaken solely to increase ratings and profits for Bravo's program.

161. Defendants' conduct was intentional, willful, and reckless, performed with conscious disregard for the privacy and safety of Plaintiff's children and for Plaintiff's parental rights.

162. As a proximate result, the children experienced humiliation, ridicule, and loss of anonymity, and Plaintiff suffered severe emotional distress and interference with his custodial rights.

**WHEREFORE**, Plaintiff Chuvalo M. Ferrell respectfully demands judgment jointly and severally against Defendants Bravo Media, LLC; NBCUniversal Media, LLC; Truly Original, LLC; and Shanae Humphrey in the amount of one hundred million dollars ($100,000,000.00) in compensatory damages and one hundred million dollars ($100,000,000.00) in punitive damages; together with attorney's fees and litigation costs under all available statutory authorities including O.C.G.A. § 13-6-11, O.C.G.A. § 10-1-399(d), 42 U.S.C. § 1988, and 28 U.S.C. § 1927.

## COUNT VIII – NEGLIGENT ENTRUSTMENT AND SUPERVISION (AGAINST NBCUNIVERSAL AND BRAVO MEDIA)

163. Plaintiff incorporates by reference all previous paragraphs as if fully set forth herein.

164. NBCUniversal and Bravo Media had a duty to ensure compliance with all child-filming, consent, and privacy laws in connection with their production of The Real Housewives of Atlanta.

165. Despite that duty, they negligently supervised and entrusted production authority to Truly Original and Shanae Humphrey, who engaged in illegal and unauthorized recording of Plaintiff's minor children.

166. Defendants failed to implement safeguards or verify consent protocols, amounting to negligence and reckless disregard for foreseeable harm to the minors.

167. As a direct and proximate result, Plaintiff and his minor children sustained emotional and reputational injury, invasion of privacy, and loss of security in their family life.

**WHEREFORE**, Plaintiff Chuvalo M. Ferrell respectfully demands judgment jointly and severally against Defendants NBCUniversal Media, LLC; Bravo Media, LLC; Truly Original, LLC; and Shanae Humphrey in the amount of one hundred million dollars ($100,000,000.00) in compensatory damages and one hundred million dollars ($100,000,000.00) in punitive damages; together with attorney's fees and costs of litigation recoverable under O.C.G.A. § 13-6-11, O.C.G.A. § 10-1-399(d), 42 U.S.C. § 1988, and 28 U.S.C. § 1927; and for permanent injunctive relief barring said Defendants and all affiliated entities from any future dissemination, distribution, or rebroadcast of said unauthorized materials, as well as any further lawful relief this Court deems appropriate and necessary to vindicate Plaintiff's and his minor children's rights.

Respectfully submitted.


/s/ Kenneth Muhammad
Kenneth Muhammad, Esq., Bar ID 527907
10 Glenlake Parkway, Ste. 130
Atlanta, Georgia 30328
1800-910-5760 (p)
kenneth@lawofficekwm.com
*Attorney for Plaintiff*

_____PRO HAC VICE TO BE FILED FOR

Latoya Francis-Williams, Esq.
Law Office of Latoya A. Francis-Williams
P.O. Box 451
Randallstown, Maryland 21133
410-356-4691 (office); 410-356-1248 (fax)
info@lfwlaw.org
*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## (ATLANTA DIVISION)

| | |
|---|---|
| CHUVALO M. FERRELL<br>1040 Flat Shoals Rd SE<br>Conyers, GA 30013<br>　　　　　　　Plaintiff,<br><br>v.<br><br>Bravo Media, LLC.<br>30 Rockefeller Plaza<br>New York, NY 10112<br><br>and<br>NBCUniversal Media, LLC.<br>30 Rockefeller Plaza<br>New York, NY 10112<br><br>and<br>Truly Original, LLC.<br>120 Broadway, 17th Floor<br>New York, NY 10271<br><br>and<br>Shanae Humphrey<br>5307 Wilkinson Ave. Unit 6A<br>Valley Village, CA 91607<br><br>　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) Case No.:<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## JURY TRIAL DEMAND

**COMES NOW** Plaintiff, CHUVALO M. FERRELL, and hereby

demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Kenneth Muhammad
Kenneth Muhammad, Esq., Bar ID 527907
10 Glenlake Parkway, Ste. 130
Atlanta, Georgia 30328
1800-910-5760 (p)
kenneth@lawofficekwm.com
*Attorney for Plaintiff*

PRO HAC VICE TO BE FILED FOR
Latoya Francis-Williams, Esq.
Law Office of Latoya A. Francis-Williams
P.O. Box 451
Randallstown, Maryland 21133
410-356-4691 (office); 410-356-1248 (fax)
info@lfwlaw.org
*Attorney for Plaintiff*